IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHAWN SOWELL-ALBERTSON,

        Plaintiff,

vs.                                               CIVIL NO.  04-760 RB/LFG

THOMAS & BETTS CORPORATION,

        Defendant.

## MEMORANDUM OPINION AND ORDER
## ON PLAINTIFF'S MOTION REGARDING E-MAIL EXPERT,
## AND ON DEFENDANT'S MOTION FOR ASSESSMENT OF COSTS

THIS MATTER is before the Court on interrelated motions: Plaintiff's Motion Regarding Defendant's E-Mail Expert [Doc. 41]; and Defendant Thomas & Betts Corporation's Motion for Assessment of Costs Associated with Production by Expert Witness [Doc. 57].

## Background

Plaintiff Shawn Sowell-Albertson was initially hired by Defendant Thomas & Betts as a master scheduler.  She received two promotions and held the Materials Manager position at the time a new Plant Manager, Charlie Ochinegro ("Ochinegro"), became responsible for the facility.  Plaintiff contends that as Materials Manager, she was considered "plant staff" paid at Grade 14 and eligible for Thomas & Betts' profit incentive plan.  She states that all other employees of Defendant described her as an excellent manager and employee.  She was demoted from her Materials Manager position to a Purchasing Manager and no longer considered plant staff, and, therefore, no longer eligible for T&B's employee benefit plan.

Plaintiff contends that her supervisor, Ochinegro, engaged in inappropriate sexual innuendo directed toward another woman employee, Linda Mojica-Stallings. Ms. Stallings ultimately reported the incident to Plaintiff. As Ms. Stallings' manager, Plaintiff was responsible for following up on the complaint and did so by speaking with Ochinegro about it. Plaintiff states that Ochinegro claimed Ms. Stallings misunderstood his comments. However, after Plaintiff attempted to investigate the claim, she contends that her own job was doomed. Plaintiff alleges that Ochinegro specifically selected males for the Materials Manager position and did not invite Plaintiff to apply, and further that he directed Edward Zielinski ("Zielinski") and John Young ("Young") to find reasons to fire Plaintiff. Plaintiff alleges that Ochinegro pressured these other supervisors to find reasons--"any reason"--to force her out of work. Ultimately, Plaintiff contends that she was constructively discharged.

A key piece of evidence which Plaintiff relies on in support of her claim that Ochinegro directed other supervisors to find fraudulent reasons to terminate her is an e-mail provided to her by Young. Young testified that he received a January 7, 2003 e-mail from Ochinegro, which stated in part, "This is the kind of sh** I am talking about.[1] You need to find a reason to fire Shawn and fast." The e-mail was provided by Young to Plaintiff after she resigned from her position. This e-mail, of course, is relied on by Plaintiff as the "smoking gun" to support her contentions.

Defendant denies Plaintiff's claims of discrimination and asserts that Plaintiff is unable to demonstrate that similarly situated male employees were treated more favorably than Plaintiff. Even looking at management level male employees, such as Zielinski and Young, Defendant contends that Plaintiff is unable to demonstrate that either was treated more favorably than she was and, indeed,

---

[1] In this opinion, the Court substituted "sh**" for the complete text. The full statement is apparent and there is no need to have the actual word in the opinion.

Zielinski was terminated after approximately six months. Plaintiff concedes that Young, too, was subjected to improper treatment, and she feared that he would also be terminated by Ochinegro.

Defendant contends that Plaintiff is unable to demonstrate that the workplace was permeated with discriminatory intimidation, ridicule and insult that was so sufficiently severe or pervasive to alter the conditions of her employment or to create an abusive working environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 (1993).

## Proposed Expert Evidence

Defendant states that Plaintiff's key evidence is the claimed e-mail from Ochinegro to Young directing Young to fire Plaintiff. However, Thomas & Betts retained an expert who reviewed the e-mail in question to determine its authenticity. Its expert concluded that the original e-mail from Ochinegro to Young did not contain the language directing Young to fire Plaintiff and that language was subsequently and fraudulently inserted into the body of the e-mail by someone else. The Defendant argues that Plaintiff's evidence is a sham and a fraud.

During discovery, Defendant identified electronic evidence that e-mails were forged by a former employee. The evidence disclosed included twelve DLT back-up tapes of the Albuquerque facility's e-mail system. Those tapes were offered to Plaintiff for copying. Plaintiff did not request the opportunity to copy the tapes at her own expense.

Defendant proceeded to have the tapes reviewed and reconstructed by its own expert from the DLT back-up tapes in the company's Albuquerque facility. Defendant submitted its expert's affidavit stating that multiple steps are involved in the restoration of the three individual group-wise data bases and burning of the DVDs. In justifying the costs incurred, Defendant's expert, Dr. Bruce V. Hartley, testified:

3

> To restore the Group Wise databases from the DLT 4 tapes, the following steps must be taken:  Recreate Novell Netware environment, Install Arcserve for Netware, Catalog (merge) the 3 DLT 4 tapes, and Restore Group Wise data from the 3 DLT tapes.
>
> The charges are off our standard price list for the type of person being used on the project.  Our standard forensics engineer rate is $200.00 per hour.  The number of hours estimate was based on the amount of time it takes to re-build the databases from tape and export them.
>
> The DVD charge is not just for the media, but the time it takes to burn and QC the product.  The process for burning a DVD involves indexing the data to be copied to the DVD, caching that data to the computer with the DVD burner, and then burning the DVD.  While it will require approximately 15-20 minutes to actually burn the DVD, the preceding steps can take up to an hour.  After each DVD is burned, the data is copied from the DVD to a computer on-site to insure that the burn was completed without error.

Defendant proceeded to have the databases reconstructed at its own expense, and pursuant to an agreement with Plaintiff's counsel, delivered the reconstructed databases to her expert.  Because the parties disputed whether there should be cost shifting, the parties agreed to submit the issue of cost sharing to the Court.  Defendant now asks the Court to order that Plaintiff share the costs.

### **Results of Defense Expert's Reconstruction of Databases**

Defense expert Hartley was assigned the task of evaluating electronic mail messages to and from Defendant's Albuquerque facility, assessing the process used to extract messages, and providing an opinion as to the authenticity of the e-mail messages sent by Young.  The purpose of the evaluation was to determine if the electronic mail sent by Ochinegro to Young was altered prior to the time Young forwarded the same mail to himself at two separate e-mail addresses and to Diane Brown.

The approach taken by Defendant's expert was to review 3 DLT tapes, which contained full back-up copies of the ABQ Group Wise domain and the ABQ One Group Wise post office.  Dr.

Hartley recreated the Novell Net Ware environment in an effort to recreate the entire environment. He did so by installing Novell Net Ware 5.1, support pack 6; installing Group Wise 6.0; installing Group Wise, support pack 2; installing Arcserve 9.1 for Net Ware on Net Ware server; and installing Arcserve Administration Client on a second machine.

Briefly stated, the process utilized by Hartley involved searching the original electronic message sent from Ochinegro to Young and comparing it to the electronic mail messages forwarded by Young to himself and to Diane Brown. The process and results of Hartley's efforts are set forth in detail in the briefing.

Based on the data obtained during the restoration, Hartley concluded that the original message from Ochinegro to Young and another employee did not contain the text, "This is the kind of sh** I am talking about. You need to find a reason to fire Shawn and fast." Hartley's conclusion was based on the fact that the message recovered from Ochinegro's mailbox, as well as his copy folder did not contain the text string in question. Moreover, the message recovered from the other employee's mailbox was identical to that contained in Ochinegro's. In neither case was the text string included.

### **Electronic Discovery**

Proposed modifications to Fed. R. Civ. P. 26(b)(2) state that, "[A] party need not provide discovery of electronically stored information that the party identifies as not reasonably accessible." In this case, however, the issue is not so much the difficulty of accessing or retrieving the information Plaintiff sought, but the cost of doing so.

Recognizing that electronic information is indeed discoverable, Defendant proceeded appropriately by recreating the databases and producing the information at its own cost. So as not to promote delay in providing the information to Plaintiff, Defendant did so with an agreement that it would seek Court approval for cost shifting.

Cost shifting is included in the American Bar Association's 1999 Civil Discovery Standards, which includes standards addressing parties' duties to preserve electronic data and standards for shifting the costs of production of electronic discovery. The American Bar Association's Section on Litigation published proposed amendments in early 2004 to the 1999 electronic discovery standards and, after a review and comment period, the proposed amendments were adopted in revised form by the American Bar Association's House of Delegates.[2]

When a court is faced with issues of cost shifting, the Standards offer a detailed analysis for determining when and how, if at all, to shift costs. The following factors are to be considered:

> (a) The burden and expense of the discovery considering, among other factors, the total cost of production in absolute terms and as compared to the amount in controversy;
>
> (b) the need for the discovery, including the benefit to the requesting party and the availability of the information from other sources;
>
> (c) the complexity of the case and the importance of the issue;
>
> (d) the need to protect the attorney-client privilege or attorney work product including the burden and expense of a privilege review by the producing party and the risk of inadvertent disclosure of privileged or protected information despite reasonable diligence on the part of the producing party;
>
> (e) the need to protect trade secrets, and proprietary or confidential information;
>
> (f) whether the information or the software needed to access it is proprietary or constitutes confidential business information;
>
> (g) the breadth of the discovery request;
>
> (h) whether efforts have been made to confine initial production to tranches or subsets of potentially responsive data;

---

[2]These standards are available at the ABA's Litigation Section on the Internet at www.abanet.org/litigation.

6

      (i)  the extent to which production would disrupt the normal operations and processing routines of the responding parties;

      (j)  whether the requesting party has offered to pay some or all of the discovery expenses;

      (k)  the relative ability of each party to control costs and its incentive to do so;

      (l)  the resources of each party as compared to the total cost of production;

      (m)  whether responding to the request would impose the burden or expense of acquiring or creating software to retrieve potentially responsive electronic data or otherwise require the responding party to render inaccessible electronic information accessible, where the responding party would not do so in the ordinary course of its day-to-day use of the information;

      (n)  whether the responding party stores electronic information in a manner that is designed to make discovery impracticable or needlessly costly or burdensome in pending or future litigation, and not justified by any legitimate personal, business or non-litigation related reason; and

      (o)  whether the responding party has deleted, discarded or erased electronic information after litigation was commenced or after the responding party was aware that litigation was probable and, if so, the responding party's state of mind in doing so.

    The first factor, the burden and expense of discovery, primarily affected Defendant. Certainly when Plaintiff disclosed that she had this damning piece of evidence--the alleged Ochinegro e-mail to Young--it was necessary for Defendant to restore and reconstruct the DLT 4 tapes simply in an effort to defend itself against the claims. This would have occurred even if Plaintiff had never made a demand for production of the databases. However, when Plaintiff demanded production of "an exact replica of the Novell Wise Data Base examined by Mr. Hartley, transmitted on hard drive DVD-ROMs sent to him at the address on the business card and email above," she, too, recognized that this evidence was critical to her claims and Defendant's defenses.

Plaintiff argued that her own expert, Jerry Saperstein, opined that Defendant's opinions were without factual foundation, and that there may be flaws in the reconstructed databases that cannot be determined without examination and study. Plaintiff further argued that Mr. Saperstein "can prove the inadequate foundation of Mr. Hartley's opinion if he can study an exact replica of the Norvell Group Wise data base submitted to Mr. Saperstein on hard drove or DVD-ROMs. Thus, it is clear that Plaintiff was making the same demand for access to this information. Accordingly, even if Defendant had not already advanced the production costs, Plaintiff was demanding that information be provided to her.

The amount incurred in the reconstruction was relatively small and totaled $1,375, including five hours of labor for a forensic engineer at $200 an hour, and three DVDs at a cost of $125 each. It is clear that the information will benefit both Plaintiff and Defendant. Thus, unlike many other cases where the electronic discovery costs are huge, the amounts in controversy should not impose unconscionable burdens on either Plaintiff or Defendant.

The Court must then consider the need for discovery. In this case, it is critical. The "smoking gun" e-mail from Ochinegro to Young is of substantial benefit to support Plaintiff's claims against Defendant. On the other hand, should a fact finder conclude that the evidence was manufactured and fraudulently created, the effect on Plaintiff's claim could be exceedingly detrimental. This information was available only through the highly technical, complex and costly process utilized by Defendant, and not available from other sources. Thus, it was absolutely necessary that the funds be expended and the information obtained.

The Court must consider the complexity of the case and the importance of the issues. While Title VII litigation is generally not complex and relatively straight forward, this item of evidence is most unusual. Typically in employment litigation, a plaintiff can only prove the case through indirect

evidence or inferences that may be legitimately drawn from direct evidence. It is a relatively rare instance where specific, direct evidence of discrimination may be available.

In this case, Plaintiff relies on this e-mail as direct evidence of Ochinegro's discrimination intent. Thus, the critical Ochinegro e-mail is of significant importance in both the prosecution and defense of this case.

No party asserts that the information is protected under attorney-client privilege, attorney work product or that there is risk of inadvertent disclosure of privileged or protected information. So, too, no party asserts that trade secrets, or proprietary and confidential information are implicated.

The Court considers whether the information or software needed was proprietary or constitutes confidential business information. While it was necessary to recreate and reconstruct the e-mails through the use of various software programs, i.e., Novell Netware 5.1, support pack 6, Groupwise 6.0, Arcserve 9.1, etc., the software was apparently available to Defendant's expert under some appropriate license agreement, and its use would not constitute a disclosure of confidential information, nor is the subject of the e-mail itself subject to some privilege that would prevent its discovery.

The Court further considers the breadth of discovery request. Fortunately, there was but a single e-mail transmission at issue and the mailboxes of relatively few individuals needed to be searched and reconstructed. The Court notes that Plaintiff's request was not overly broad. As a result, the parties were able to confine their search for information to sub-sets of potentially responsive data.

The Court examines the extent to which production would disrupt the normal operations and process routines of the responding party. Here, it is clear that reconstruction and restoration of this kind of information is not routinely done by Defendant, and it was necessary for Defendant to hire an

9

outside expert for purposes of its own investigation and for producing information pursuant to Plaintiff's request. Costs and fees were incurred in the process. The cost of reconstruction is not part of Defendant's day-to-day business operation.

The Court considers whether the party offered to pay some or all of the discovery expenses. In this case, Plaintiff declined Defendant's initial request for cost sharing, and she continues to oppose cost sharing. (*See* Response to Defendant's Motion for Assessment of Costs). The relative ability of each party to control costs and its incentive to do so must also be considered. There is no claim or contention that Defendant intentionally created an operating system that promotes non-disclosure of information. To the contrary, the e-mail system utilized by Defendant is likely used by a majority of businesses. Defendant appropriately maintained off-site back-up files which were used to restore or reconstruct the e-mails.

The Court assesses the parties' resources as compared to the total cost of production. Undoubtedly, the Defendant, a corporation, has resources that far exceed Plaintiff's individual resources. However, the costs of production in this case are relatively minor and the benefit of providing the information is significant to both parties.

The Court must consider whether responding to the request imposes burdens or expenses of acquiring or creating software to retrieve this information. Such is the case. It is clear that Defendant retained an expert who utilized a variety of programs and techniques to search business records and mailboxes of individuals to determine how and when this e-mail was created. There is no indication that the creation and restoration of databases would have been done in the ordinary course of business. Nor is there information which indicates that the Defendant stored the electronic information in a way to make recovery impracticable or needlessly costly or burdensome in future litigation. It appears that Defendant's electronic messaging system is the type used in general business practices.

Finally, there is no evidence that Defendant intentionally deleted, discarded, or erased information in an effort to thwart Plaintiff's ability to prove her case.

Key decisions affecting electronic discovery appear in a series of rulings by the Honorable Sarah A. Scheindlin with the United States District Court for the Southern District of New York. In Zubulake v. UBS Warburg LLC, 217 F.R.D. 307 (S.D.N.Y. 2003), Judge Scheindlin ordered a defendant to (1) bear the costs of producing all accessible data and (2) restore a sample of back-up tapes to determine if cost shifting is appropriate. Judge Scheindlin began her cost-shifting analysis by noting that "[a]ny principled approach to electronic evidence must respect [the presumption that] the responding party must bear the expense of complying with discovery requests." Id. at 317 (*quoting* Oppenheimer Fund v. Sanders, 437 U.S. 340, 398 (1978)). Judge Scheindlin noted that "cost shifting should be considered only when electronic discovery imposes an 'undue burden or expense' on the responding party." Id. at 318, *citing* Fed. R. Civ. P. 26(c). Whether production is unduly burdensome or expensive "turns primarily on whether it is kept in an accessible or inaccessible format . . . ." Judge Scheindlin held that it is appropriate to consider cost shifting when inaccessible data is sought (back-up tapes, erased, fragmented or damaged data), but not when accessible data is sought (active, on-line data, near-line data, off-line storage/archives).

Here, Defendant's expert was able to reconstruct and reconfigure otherwise inaccessible data from back-up tapes and erased, fragmented or damaged data. Thus, the information sought was not active, on-line data, near-line data, or off-line storage and archival material.

11

In reaching her decision, Judge Scheindlin considered a seven-part test which parallels the ABA's discovery standards as modified by the House of Delegates Proposed Amendments to the 1999 Electronic Discovery Standards.[3]

In a subsequent Zubulake decision, Zubulake 3, 216 F.R.D. 280 (S.D.N.Y. 2003), Judge Scheindlin ordered the plaintiff to bear twenty-five percent of the costs associated with restoring and searching certain back-up tapes. The court did not order shifting of the costs associated with producing the restored e-mails. The court noted, "precise allocation is a matter of judgment and fairness rather than a mathematical consequence of the seven factors" and determined that "[b]ecause the seven-factor test requires that UBS pay the lion share, the percentage assigned to Zubulake must be less than fifty percent." Id. at 289.

The court was primarily guided by a concern that cost shifting would "chill the rights of litigants to pursue meritorious claims," but that some cost shifting was appropriate to ensure that the defendant's expenses would not be "unduly burdensome." Ultimately, in Zubulake 3, the court assigned a twenty-five percent figure to Zubulake to meet those goals. Id.

In this case, Defendant is asking for costs incurred in restoring the information (5 hours at $200 per hour), but also the costs of producing the DVDs (3 DVDs at $125 each). In Zubulake 3, the court noted that the responding party should always bear the costs of reviewing and producing the electronic data which has been converted to an accessible form, but that converting the data to an accessible form is the kind of cost that should be shared.

---

[3]Judge Scheindlin's seven-factor test included (1) the extent to which the request is specifically tailored to discover the relevant information; (2) the availability of such information from other sources; (3) the total cost of production compared to the amount in controversy; (4) the total cost of production, compared to the resources available to each party; (5) the relative ability of each party to control costs and its incentive to do so; (6) the importance of the issues at stake to the litigation; and (7) the relative benefits to the parties of obtaining the information. Id. at 322.

Using Judge Scheindlin's approach, Plaintiff in this case should equally bear the cost of restoring the data ($200 per hour times 5 hours), for a total of $1,000. Thus, her cost should be one-half of that, or $500. However, Defendant, the responding party, should bear the entire cost of producing the information to Plaintiff (3 DVDs at $125 each). This is true because "the producing party has the exclusive ability to control the cost of reviewing the documents" and "once the data has been restored to an accessible format and responsive documents located, cost shifting is no longer appropriate." Id. at 290-91.

Judge Scheindlin's approach in Zubulake makes perfect sense. In this case, an analysis of the ABA factors does not specifically favor one party over the other. The information was necessary for both; no party intentionally sought to obfuscate, destroy or hide documents. The information would not have been necessary but for Plaintiff's claims that she possessed the "smoking gun" and Defendant's assertion that Plaintiff's evidence was a fraudulently produced e-mail.

Finally, the costs are not oppressive and the Court does not believe that requiring Plaintiff to contribute to the costs of restoration of the tapes would chill her interest in pursuing legal claims. In sum, the Court adopts the approach in Zubulake 3 and orders Plaintiff to reimburse Defendant the sum of $500 within thirty days of entry of this order.

IT IS THEREFORE ORDERED that:

(1) Plaintiff's motion [Doc. 41] regarding Defendant's e-mail expert is DENIED as moot, as the information has been provided; and (2) Defendant's motion for assessment of costs [Doc. 57] is GRANTED to the extent indicated herein.

                                                                                    Lorenzo F. Garcia
                                                                                    Chief United States Magistrate Judge