IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHAWN SOWELL-ALBERTSON,

      Plaintiff,

vs.                                        No. CIV 04-0760 RB/LFG

THOMAS & BETTS CORPORATION,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's ("T & B's") Motion for Summary Judgment (Doc. 64), filed on April 15, 2005. Jurisdiction is founded upon 28 U.S.C. § 1331. Having considered the submissions of the parties, relevant law, and being otherwise fully advised, I find that this motion should be denied.

**I.    Background.**

In April 2000, Plaintiff ("Albertson") was hired by T & B to work as Master Scheduler in its Elastimold plant in Albuquerque, New Mexico. (Pl. Ex. 1.) Albertson received a positive performance review from Plant Manager Larry Smith. (*Id.*) This evaluation was the only job review that Albertson received while employed at T & B.[1] (*Id.*) In November 2000, Albertson was promoted to Purchasing Manager. (Def. Ex. A.) The promotion entailed a salary increase from $54,000.00 to $65,266.00, and an increase in her T & B job-classification grade from 10 to 13. (*Id.*) In July 2001, Al Borgstrom, Interim Plant Manager, promoted Albertson to Materials Manager. (*Id.*)

---

[1] After Albertson resigned in January 2003, she received a merit salary increase of $1,430.00 per year, retroactive to July 2, 2002. (Def. Ex. K.)

The Materials Manager promotion increased Albertson's salary from $65,266.00 to $71,500.00 and increased her grade from 13 to 14.[2] (*Id.*)

In October 2001, T & B appointed Charlie Ochinegro as Plant Manager. (Def. Ex. A.) In November and December 2001, Ochinegro told Albertson that the Shipping, Customer Service, and Master Scheduling Departments would report to her as of January 1, 2002. (Pl. Ex. 1.) Ochinegro did not reassign these departments to Albertson. (*Id.*) On January 2, 2002, an employee in the Materials Department found Albertson's job posted on monster.com. (*Id.*)

Albertson confronted Ochinegro and the plant Human Resources Director, Uly Taylor, about the posting for her job. (Pl. Ex. 1.) Ochinegro apologized that he had not informed Albertson that he was advertising for a new candidate for her job. (Def. Ex. A.) Ochinegro stated that he was looking for someone with more experience in lean manufacturing processes to fill the Materials Manager position. (*Id.*) At the time, T & B had a corporate drive to implement lean manufacturing processes. (Def. Exs. A and F.) Ochinegro told Albertson that she was demoted to Purchasing Manager because Ochinegro wanted Albertson to focus on purchasing. (*Id.*)

The demotion did not entail a decrease in salary, but it is undisputed that the Purchasing Manager position was classified as grade 13. (Def. Ex. A.) Albertson's job responsibilities remained the same. (*Id.*) As Materials Manager, Albertson reported directly to Ochinegro. (Pl. Ex. 1.) As Purchasing Manager, Albertson was a senior manager reporting to Ochinegro, and a plant staff member reporting to Smith and Borgstrom. (*Id.*) However, until a Materials Manager was hired,

---

[2] Albertson testified at her deposition that her grade increased from 13 to 14 when she was promoted to Materials Manager. (Def. Ex. A.) However, the T & B promotion form indicates that her grade remained at 13. (Def. Ex. G.) Construed in the light most favorable to Albertson, the record establishes that she held the grade of 14 during her tenure as Materials Manager.

Albertson continued to report to Ochinegro. (Def. Ex. A.) As Purchasing Manager and as Materials Manager, Albertson supervised two or three employees. (Pl. Ex. 1.)

Prior to the demotion, Albertson had never been written up, admonished, disciplined, or criticized. (*Id.*) During her employment with T & B, Albertson had numerous successes, including reduced inventory, reduced costs, increased efficiency, and unblemished audits. (*Id.*) In their depositions, other T & B employees praised Albertson as "brilliant" and "excellent." (Pl. Ex. 6, 7, 8, and 9.)

In March 2002, Ochinegro hired Ed Zielinski as Materials Manager. (Pl. Ex. 1.) Zielinski was an outsider male with no experience working in a plant the size of the Albuquerque plant. (*Id.*) Zielinski was terminated in September 2002. (*Id.*) After Zielinski was terminated, Ochinegro assigned Albertson the reporting duties of Materials Manager, even though she still held the title of Purchasing Manager. (*Id.*)

Albertson did not apply for the Materials Manager vacancy created by the termination of Zielinski. (Def. Exs. A, D, and F.) T & B received about 30 resumes for the opening and interviewed about six candidates. (Def. Ex. D.) Initially, the position was offered to a female, who turned it down. (*Id.*) In November 2002, John Young, a male, was hired as Materials Manager. (Pl. Ex. 1.) At the time he was hired, Young had more current working knowledge of lean manufacturing experience than did Albertson. (Def. Exs. A, I.) As Materials Manager, Young was Albertson's direct supervisor. (Def. Ex. A.) During his job interview, Ochinegro indicated to Young that Young needed to find a way to get rid of Albertson. (Def. Ex. I.)

During the week of September 3, 2002, one of the employees supervised by Albertson, Linda Mojica, reported to Albertson that Ochinegro had made a sexual comment and leered at Mojica

3

during an office potluck. (Pl. Ex. 1.) Linda Stallings, another employee supervised by Albertson and a witness to the incident, described the incident as "brutal." (Pl. Ex. 7.) For the following two weeks, Albertson was out of the office on vacation. (Pl. Ex. 1.)

After she returned from vacation, on September 26, 2002, Albertson invited Ochinegro into her office, closed the door, informed him that his behavior towards Mojica was inappropriate, and asked him never to make such comments to any employee that she supervised. (Pl. Ex. 1.) After the closed-door conversation, Ochinegro excluded Albertson from management meetings and started to blame her for problems caused by other departments. (Pl. Ex. 1.) Albertson was the only manager excluded from management meetings by Ochinegro. (*Id.*) Ochinegro told his secretary, Lara Kaskabas, not to invite Albertson to staff meetings. (Pl. Ex. 3.)

Ochinegro continued to communicate to Young Ochinegro's desire to get rid of Albertson. (Pl. Ex. 21.) In conversations with Young, Ochinegro referred to Albertson as "that bitch." (*Id.*) Despite these directives, Young found that Albertson was a "very diligent" worker and did her job well. (*Id.*) Young relied on Albertson's experience and he did not want to fire Albertson. (*Id.*)

Beginning in November 2002, Ochinegro assigned Albertson additional responsibilities, falsely accused Albertson of causing problems, undermined her authority, berated Young for not performing duties properly performed by Albertson, blamed Albertson for errors caused by others, and continued to pressure Young to fire Albertson. (Pl. Ex. 1.) Ochinegro excluded Albertson from a dinner with a vendor, in spite of the fact that Albertson was T & B's primary contact with that vendor. (Pl. Ex. 3.) Ochinegro continued to exclude Albertson from management meetings. (Def. Ex. A.) Albertson testified in her deposition that her absence from the meetings negatively impacted her job performance, but she did not testify to a specific instance where her absence from a particular meeting

4

caused a problem for her performance. (*Id.*)

On November 15, 2002, Albertson reported Ochinegro's alleged discriminatory treatment to Borgstrom, who was Ochinegro's supervisor. (Pl. Ex. 1.) Albertson and other employees were afraid to report any negative information about Ochinegro to Taylor because Taylor and Ochinegro were "thick as thieves" and Taylor had been brought to the Albuquerque plant by Ochinegro. (Pl. Exs. 1, 9, 12, 21; Def. Ex. A.) Borgstrom suggested that Albertson contact Diane Brown, the T & B corporate Human Resources Manager. (Pl. Ex. 1.) Albertson contacted Brown, and Brown commenced an investigation from the T & B home office in Tennessee. (Def. Ex. A.)

On December 16-17, 2002, Brown traveled to Albuquerque for an on-site investigation. (Pl. Ex. 1.) Brown arrived in Albuquerque with the intention of terminating Ochinegro. (Def. Ex. Z.) Brown and Albertson had a detailed conversation about how Ochinegro was mistreating Albertson. (Pl. Ex. 1.) Albertson gave the names of three other women who would feel comfortable speaking with Brown about the alleged harassment. (*Id.*) One of the women declined to speak to Brown, but the other two were interviewed. (*Id.*) Albertson asked Brown to document her findings and any corrective action taken by T & B. (*Id.*)

On December 23, 2002, Brown sent Albertson an e-mail summarizing the investigation and Brown's findings. (Def. Ex. BB.) Brown documented that she had a "serious conversation" with Ochinegro with Taylor present. (Pl. Ex. 1.) Brown advised Albertson that Ochinegro had "management issues." (*Id.*; Def. Ex. A.) Brown reminded Albertson that Albertson now had Young as her boss and that Albertson should work through Young. (Def. Ex. BB.) Brown suggested that Albertson should allow her performance to speak for itself and acknowledged that Albertson's performance statistics indicated that she was doing a good job. (Def. Exs. A and BB.)

5

Brown testified at her deposition that she determined that there were "definitely some management-style related issues" and that Ochinegro's management style was very authoritarian, he micro-managed, lacked patience, and did not provide positive leadership. (Def. Ex. Z.) During the December 17, 2002 meeting, Brown told Ochinegro that reports out of Albuquerque had to improve or he would be terminated. (*Id.*) Ochinegro cried and pleaded that he was only two years from retirement. (*Id.*) Brown thought that management training might help Ochinegro. (*Id.*)

On January 7, 2003, Ochinegro sent Young an e-mail directing Young to fire Albertson "and fast!!!" (Pl. Exs. 1 and 22.) Young shared this information with Albertson. (*Id.*) On January 8, 2003, Albertson informed Young that she was resigning effective January 10, 2003. (Def. Ex. M.) Albertson called Brown, who was out of the office for the week. (Def. Ex. Z.) Albertson left Brown a voice message that Albertson resigned her employment. (*Id.*)

Based on Ochinegro's negative comments, the systematic exclusion from meetings, and misplaced blame, Albertson believed that it was only a matter of time until Ochinegro fired her. (Pl. Ex. 1.) Albertson feared that her every decision would be questioned, challenged, and talked about by Ochinegro behind her back. (*Id.*) Due to the stress, Albertson's health declined and she felt compelled to resign on January 8, 2003. (*Id.*; Def. Exs. L-M.)

In 2001 and 2002, Albertson received only a "pick as gift" book valued at $25.00 one year and $50.00 another year as a Christmas bonus. (Pl. Ex. 1.) Albertson believed that male managers received much larger cash bonuses. (*Id.*) In 2003, Taylor received a $10,000 cash bonus, and in 2004, Taylor received a $3,000 or $4,000 cash bonus. (Pl. Ex. 4.) Taylor testified in his deposition that, in order to be eligible for a cash bonus, the individual had to be a manager with a salary grade level of 15 or above and satisfy other criteria rendered by T & B. (*Id.*) Taylor testified that, at the

Albuquerque plant, the Plant Manager, Human Resources Manager, Controller, Materials Manager, Engineering Manager, and Production Manager were eligible for cash bonuses if they held the grade of 15 or above. (*Id.*)

During Albertson's employment, there were at least nine management positions at the Albuquerque plant, but Albertson was the only female manager. (Compl. ¶ 9-10.) After Albertson resigned, T & B had no female managers at the Albuquerque plant. (Pl. Ex. 1.) As of 2004, there were no female managers at the Albuquerque plant, despite several management-job openings. (Pl. Ex. 4.) Taylor was aware that a female employee had complained that male employees were changing clothes in the open in the Albuquerque plant maintenance shop, and that a male employee told the complaining female employee that "this is a man's maintenance shop." (Pl. Ex. 2.)

Ochinegro was "almost always" condescending to women and dismissed the opinions of women. (Pl. Exs. 3 and 9.) Ochinegro referred to women, in general, as "little girls" or "ditzes." (Pl. Ex. 3 and 13.) Ochinegro referred to specific female employees as "really hot," and others as "the ugly one," or "the fat troll." (Pl. Ex.3.) Ochinegro treated women "like dirt" and yelled at them. (Pl. Ex. 11.) Ochinegro berated his female secretary, Lara Kaskabas, and called her "sweetheart," "baby," "baby doll," "honey," "darling," and "sweetie." (Pl. Ex. 3.) Young testified in his deposition that Ochinegro was "probably the most unprofessional person [he had] ever worked with." (Def. Ex. I.)

A female employee, Sara Huskins, was set to go on a training trip. (Pl. Ex. 3.) At the last minute, Ochinegro gave the trip to a male employee instead of Huskins. (*Id.*) Ochinegro submitted a $220.00 expense report for entertaining male managers at an Albuquerque strip club. (Pl. Exs. 15 and 16.) A female employee was laid off two weeks after she questioned the expense report. (*Id.*) Kaskabas testified that the atmosphere at the plant was rough. (Pl. Ex. 3.) Kaskabas did not feel safe

7

walking across the manufacturing floor because men would look at women in a threatening, sexual way.  (*Id.*)  Taylor and Ochinegro were aware of this, but did nothing to stop it.  (*Id.*)

On June 24, 2003, Albertson filed a charge of discrimination with the EEOC.  (Compl. ¶ 3.)  On April 6, 2003, the EEOC issued a right to sue letter.  (*Id.*)  On July 6, 2004, Albertson filed her complaint in this court alleging (1) gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended, ("Title VII"), and the New Mexico Human Rights Act, NMSA 1978, §28-1-1, *et seq.* ("NMHRA"); (2) negligent hiring, training and supervision under state law; and (3) wrongful termination under state law.  On February 28, 2005, Defendant's motion to dismiss was granted as to the wrongful termination claim, but the motion was otherwise denied.  T & B moves for summary judgment on all remaining claims.

**II.  Summary Judgment Standard.**

A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.'"  *Munoz v. St. Mary Kirwan Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000) (quoting Rule 56(c)).  When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party.  *Id.*

The movant bears the initial burden of establishing that no genuine issue exists as to any material fact.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)). The movant's initial burden may be discharged by showing there is an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the non-moving party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate a genuine issue for trial on a material matter. *See McGarry v. Pitkin Co.*, 175 F.3d 1193, 1201 (10th Cir. 1999).

If the moving party satisfies its initial burden, the party opposing the motion for summary judgment may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial as to a dispositive matter for which it carries the burden of proof. *See Munoz,* 221 F.3d at 1164. It is not sufficient "to simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. An issue of material fact is genuine if a reasonable jury could return a verdict for the party opposing the motion. *See Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003). The substantive law at issue determines which facts are material in a given case. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

**III.     Discussion.**

**A.     Whether allegations relating to events that occurred before August 18, 2002 are time-barred.**

This issue was addressed in my Memorandum Opinion and Order of February 28, 2005. Albertson filed her charge of discrimination with the EEOC on June 24, 2003. Title VII requires a litigant to file a claim within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e)(1). T & B argues that allegations relating to events before August 18, 2002 are time-barred.

Albertson has alleged gender discrimination based, in part, upon a hostile work environment. In a hostile work environment case, so long as an act contributing to the hostile work environment took place within the 300 day period, a court may consider the complete history of acts comprising that hostile work environment. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002); *Duncan v. City and County of Denver*, 397 F.3d 1300, 1310 (10th Cir. 2005). Many of the allegedly hostile acts occurred during the 300 day period. Thus, acts comprising the hostile work environment that occurred before August 18, 2002 may be considered as part of the hostile work environment claim. However, recovery for discrete acts of discrimination that occurred more than 300 days before the EEOC filing, such as the January 2002 demotion, is time-barred. *See Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003). Thus, only discrete acts of discrimination that occurred after August 18, 2002, may be considered in support of the disparate treatment claim.

**B. Whether Albertson presented direct evidence of discrimination.**

Both Title VII and the NMHRA prohibit employment discrimination on the basis of gender.

10

*See* 42 U.S.C. §2000e-2(a)(1) and NMSA 1978, § 28-1-7(A).[3] A plaintiff alleging employment discrimination may prove intentional discrimination through direct evidence, or through indirect evidence using the analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973). Albertson asserts that evidence showing that Ochinegro used sexist slurs to address her, stated that men were smarter than women, sexually harassed women, and offered no basis for the January 2002 demotion constitutes direct evidence of discrimination.

Direct evidence of discrimination requires proof of an existing policy which itself constitutes discrimination, *Tomsic v. State Farm Mut. Auto. Ins. Co.*, 85 F.3d 1472, 1477 (10th Cir. 1996), or "oral or written statements on the part of a defendant showing a discriminatory motivation." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000). Statements that merely state a personal opinion are not direct evidence. *Tomsic*, 85 F.3d at 1477.

Albertson has not offered proof of a T & B policy that itself constitutes discrimination. She relies on the statements of Ochinegro to show discriminatory motivation on the part of T & B. The statements of Ochinegro reflect a personal bias against women. Although such remarks can be evidence that gender played a part in an employment decision, *Tomsic*, 85 F.3d at 1478, they are not on their face expression of an existing policy which itself constitutes discrimination. Thus, Albertson has not presented direct evidence of discrimination. Albertson must rely on indirect evidence of discrimination to survive summary judgment.

---

[3]The analytical framework used for Title VII claims has been applied to claims brought under the NMHRA, and terms in both statutes have been used interchangeably. *See Ocana v. American Furniture Co.*, 135 N.M. 539, 549, 91 P.3d 58, 68 (2004). Thus, the analysis pertaining to the Title VII claims is applicable to the NMHRA claims.

**C. Whether Albertson has established a prima facie case of gender discrimination.**

A plaintiff relying on indirect evidence of discrimination has the initial burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802-804. If the plaintiff establishes a prima facie case, then the defendant must "articulate some legitimate, nondiscriminatory reason" for the challenged personnel action. *Id.* The plaintiff then bears the ultimate burden of demonstrating that the defendant's stated reason is, in fact, a pretext for unlawful discrimination. *Id.* at 804. In its motion for summary judgment, Defendant challenges only the prima facie case.

The plaintiff's burden of establishing a prima facie case is not onerous. *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). The Tenth Circuit has recently described the burden of articulating a prima facie case as "slight." *Orr v. City of Albuquerque*, ___ F.3d ___, 2005 WL 1806437 (10th Cir. Aug. 2, 2005). The plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000). The burden "is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000).

The prima facie case is a flexible standard that may be modified to accommodate different factual situations. *McDonnell Douglas*, 411 U.S. at 802 n. 13; *Plotke v. White*, 405 F.3d at 1099. The articulation of a plaintiff's prima facie case may vary, depending on the context of the claim and the nature of the adverse employment action alleged. *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1139 (10th Cir. 2000). In general, a plaintiff must produce evidence establishing that (1) she was a member of a protected class, (2) she was subjected to an adverse employment action, and (3) she was

treated differently than similarly-situated non-protected employees. *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." *Kendrick*, 220 F.3d at 1227.

T & B argues that Albertson is unable to establish a prima facie case because she did not suffer an adverse employment action.[4] The Tenth Circuit liberally construes the term "adverse employment action" and takes a case-by-case approach, examining the "unique factors relevant to the situation at hand." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004). Nevertheless, "a mere inconvenience or an alteration of job responsibilities" does not rise to the level of an adverse employment action. *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998). In order to qualify as adverse, the action must adversely affect the employee's status as an employee, *id.*, 164 F.3d at 533, such as "firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Aquilino v. Univ. of Kansas*, 268 F.3d 930, 934 (10th Cir. 2001).

Albertson relies on the November 2002 decision to hire Young for the position of Materials Manager as an adverse employment action. Albertson did not mention the non-selection in her charge of discrimination filed with the EEOC. (Def. Ex. DD.) In Title VII cases, a claimant must file a charge of discrimination within the appropriate limitations period as to each such discrete act of

---

[4] T & B's argument that a prima facie case of gender discrimination requires a plaintiff to show that similarly situated male employees were treated more favorably is not well-taken. The Tenth Circuit has expressly held that a plaintiff is not required to come forward with evidence of similarly situated employees to establish a prima facie case. *See Horizon/CMS Healthcare Corp.*, 220 F.3d at 1195 n. 6.

13

discrimination that occurred. *Morgan*, 536 U.S. at 110. Because the failure to promote was a discrete act of discrimination, and Albertson did not include it in her charge of discrimination, Albertson failed to exhaust administrative remedies as to the decision to hire Young as Materials Manager.

Even if Albertson had exhausted the failure-to-promote claim, she is unable to establish a prima facie case with respect to the failure-to-promote claim because she did not apply for the position. For her prima facie case, a plaintiff with a failure-to-promote claim must show that: (1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled or remained available. *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000).

Albertson testified in her deposition that she did not tell anyone that she wanted the Materials Manager position that was filled by Young in November 2002. Albertson believed that Borgstrom should have known that she wanted the job and should have invited her to apply. However, submission of an application for the desired position is a component of the prima facie case. *Amro*, 232 F.3d at 796. Because she failed to apply for the position, Albertson is unable to establish a prima facie case with respect to the November 2002 non-selection.

Albertson asserts that she was excluded from management meetings and verbally criticized for problems caused by other managers. She believes that male managers received larger holiday bonuses than she received. Although the threshold for an adverse employment action is not high, "not everything that makes an employee unhappy" qualifies as an adverse employment action. *Sanchez*, 164 F.3d at 533 (citations omitted). "Mere inconvenience or an alteration of job responsibilities" do not qualify as adverse employment actions. *Sanchez*, 164 F. 3d at 532 (internal quotation marks

omitted). Likewise, unrealized threats and tense personal relationships do not rise to the level of adverse employment actions. *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1381 (10th Cir. 1994). In order to qualify as an adverse employment action, the action must adversely affect the terms and conditions of the plaintiff's employment - for example, it must increase the likelihood that the plaintiff will be terminated, undermine the plaintiff's current position, or affect the plaintiff's future employment opportunities. *See Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005); *Connor v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).

The exclusion for management meetings, unfair criticism, and an unsubstantiated belief that other employees received higher bonuses did not alter Albertson's job responsibilities or any other term or condition of her employment. *See Heno v. Sprint/United Management Co.*, 208 F.3d 847, 857 (10th Cir. 2000) (holding that monitoring an employee's phone calls, moving her desk, acting in a chilly manner towards the employee, refusing to investigate her complaints, and suggesting that the employee transfer did not qualify as adverse employment actions).

There is no evidence that exclusion from management meetings prevented Albertson from performing the functions of her job on any specific occasion. While the unfair criticism was probably hurtful, there is no evidence that it was placed in Albertson's personnel file or otherwise used against her. Indeed, Brown stated that Albertson's performance statistics looked good. The undisputed evidence establishes only T & B employees at a grade 15 or higher were eligible to receive cash bonuses. Construed in the light most favorable to Albertson, the record demonstrates that she was never classified higher than grade 14. Thus, Albertson was not eligible for a cash bonus.

The actions at issue are examples of the mere inconveniences and heightened workplace tensions that the Tenth Circuit has held not actionable. *Heno*, 208 F.3d at 857. The exclusion from

15

management meetings, unfair criticism, and an unsubstantiated belief that other employees received higher bonuses does not qualify as adverse employment action.

Albertson relies on the theory of constructive discharge. An employee may satisfy the adverse employment action component of the prima facie case by demonstrating that she was constructively discharged. *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005). A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign. *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1135 (10th Cir. 2004). Working conditions must be so severe that the plaintiff simply had no choice but to quit. *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000); *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351, 1357 (10th Cir. 1997).

"If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Jeffries v. Kansas*, 147 F.3d 1220, 1233 (10th Cir. 1998). The plaintiff must show that, at the time of her resignation, her employer did not allow her the opportunity to make a free choice regarding her employment relationship. *Yearous*, 128 F.3d at 1357. The voluntariness of an employee's resignation is judged under an objective standard, from the perspective of a reasonable employee. *Exum*, 389 F.3d at 1130.

Construed in the light most favorable to Albertson, the record demonstrates a question of fact on the question of constructive discharge. This is not a case where it is apparent, beyond doubt, that Albertson can prove no facts on her claim that she effectively was forced to resign. Albertson has submitted evidence that indicates pervasive sexual harassment and aggravating circumstances that could make employment at the Albuquerque plant so objectively intolerable that a reasonable individual would feel compelled to resign. Albertson has submitted evidence sufficient to create an

16

inference that the adverse treatment was motivated by her gender. *Plotke v. White*, 405 F.3d at 1100. Because she has satisfied all three components of the prima facie case, Albertson has established a prima facie case of disparate treatment employment discrimination.

**D. Whether Albertson has established prima facie case of a hostile work environment.**

In order to establish the existence of a hostile work environment actionable under Title VII, a plaintiff must show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment. *Chavez v. Thomas & Betts Corp.*, 396 F.3d 1088, 1096 (10th Cir. 2005). There must be evidence from which "a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998). The hostile work environment must be due to the victim's gender. *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1263 (10th Cir. 1998).

The evidence demonstrates that the Albuquerque plant was a rough and unpleasant place to work. When viewed in the light most favorable to Albertson, the record establishes that the atmosphere at the Albuquerque plant was sexually charged and permeated with discriminatory animus targeted at female employees due to their gender. Ochinegro singled out Albertson, the only female manager, for mistreatment. Albertson has submitted evidence that could show that she was subjected to an unreasonably abusive work environment that detrimentally affected her working conditions and impacted her work performance. The totality of the circumstances surrounding the conduct of Ochinegro and other T & B employees is sufficient to constitute a hostile work environment.

17

Summary judgment is inappropriate under these circumstances.

**E.     Whether the *Faragher/Ellerth* affirmative defense is available.**

An employer may avoid liability for the harassing acts of its supervisory employees if it can prove a two-pronged affirmative defense. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 755 (1998). This defense is available only if no tangible employment action was taken against the plaintiff. *Faragher*, 524 U.S. at 807. Constructive discharge, if proven, would qualify as a tangible employment action. *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, (10th Cir. 2000). Because there is a question of fact as to whether Albertson was subjected to a tangible employment action, the *Faragher-Ellerth* defense is inapplicable at this stage of the proceedings.

**F.     Whether Albertson has presented a question of fact as to her negligent hiring, training, and supervision claim.**

T & B argues that it is entitled to summary judgment on the negligent hiring, training, and supervision claim. Negligent hiring or retention does not require that the employer actually know of the employee's lack of fitness, but depends on whether the employer knew or should have known that the employee posed a risk of harm. *Los Ranchitos v. Tierra Grande, Inc.*, 116 N.M. 222, 228, 861 P.2d 263, 269 (Ct. App. 1993). The elements of this cause of action are (1) the employee was unfit, considering the nature of the employment and the risk he posed to those with whom he would foreseeably associate, and (2) the employer knew or should have known that the employee was unfit. *Valdez v. Warner*, 106 N.M. 305, 307, 742 P.2d 517, 519 (Ct. App. 1987).

Viewed in the light most favorable to Albertson, a jury could conclude that Ochinegro posed a risk of harm to female employees in the Albuquerque plant. Several employees had complained about his conduct. Brown traveled to Albuquerque to investigate the situation. A reasonable fact finder could conclude that T & B should have been aware of his propensity to engage in misconduct

18

and should have provided intensive oversight to protect its female employees.  T & B is not entitled to summary judgment on this claim.

**WHEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 64), filed on April 15, 2005, is **DENIED**.

*[signature]*

---

**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**